IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK SANTIAGO, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>AMDOCS, INC. and DOES 1-50,<br><br>　　　　Defendant.　　　　　　／ | No. C 10-4317 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR DECERTIFICATION AND DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

On July 26, 2013, the Court heard argument on plaintiffs' motion for Rule 23 certification of the state law claims and defendant's motion to decertify the conditionally certified FLSA class. After consideration of the parties' arguments and briefing, the Court GRANTS defendant's motion for decertification and DENIES plaintiffs' motion for Rule 23 certification of the state law claims.

**BACKGROUND**

Plaintiffs Patrick Santiago and Robert Schussel filed this collective and class action alleging violations of the Fair Labor Standards Act ("FLSA") and the California Labor Code. Defendant Amdocs is a global technology firm that provides software products, applications, and technology services to telecommunication service providers, broadband, cable and satellite companies, and financial services providers. Plaintiffs are current and former Information Technology employees at Amdocs, and they allege that their job duties consisted primarily of providing computer support, trouble shooting, testing related to repairs and problem-solving, and technical services to Amdocs. Third Amended Compl. ("TAC") ¶ 6. Named plaintiff Patrick Santiago worked at Amdocs as a Quality Control Tester/Analyst from approximately May 2007 to December 2008, and named plaintiff Robert Schussel

worked as a Quality Control Tester/Analyst, and later as a Senior Test Engineer, from May 2007 to April 2009.

Plaintiffs claim that they and their similarly situated colleagues routinely worked more than 40 hours per week without overtime pay, and that they were not provided with required meal and rest breaks. Plaintiffs allege that they have been misclassified as exempt, and that as a result they are entitled to overtime wages and other penalties. Defendant contends that plaintiffs and the class of employees they seek to represent are properly classified as exempt, and that plaintiffs' claims of misclassification cannot be decided on a classwide basis.

The evidence[1] before the Court shows that some Amdocs employees are directly hired by Amdocs, others joined the company as a result of corporate acquisitions, and others transitioned to Amdocs as a result of managed services agreements between Amdocs and its customers whereby Amdocs hired the customers' employees who were responsible for maintaining the customers' computer systems applications, and those employees continued to work at the customers' sites. Wellman Decl. ¶ 3, Christiansen Supp. Decl. ¶¶ 3-6. Amdocs employs workers in California at Amdocs-owned or leased facilities in El Dorado Hills and San Jose, California. Wellman Decl. ¶ 11. Amdocs also employs individuals at client-owned facilities in Anaheim, Glendale, Los Angeles, Pasadena, Pleasanton, Sacramento, San Diego, San Francisco, and San Ramon, California. *Id*. In addition, some employees in California work from home. *Id*.; *see also* Santiago Depo. at 72:5-10 (worked at home once weekly); Verlanic Depo. at 46:16-17 (worked at home 2-3 per week); Graves Depo. at 13:20-24 (worked at home every day). Amdocs' Director of Compensation and Benefits - North America, Jill Wellman, states in her declaration that "[a]s a result of the multiple ways in which employees of Amdocs in California join the company, Amdocs does not maintain job descriptions for every position held." Wellman Decl. ¶ 5.

Regardless of the manner in which an employee is hired by Amdocs, when the employee is hired

---

[1] The parties have filed objections to certain evidence submitted by each side. This order resolves those objections only to the extent that the evidence at issue is cited in this order. Plaintiffs' objections that the declarations of Ms. Wellman and Ms. Christiansen "contradict" the "admissions" of Mr. Drury are not truly evidentiary objections, but attorney argument about how to characterize those witnesses' testimony.

Amdocs "maps" the employee into the "Amdocs Level System" ("ALS"), which is Amdocs' global job classification system. According to Ms. Wellman,

> The Amdocs Level System does not define specific job duties for any particular worker; nor does the system bear any relation to Amdocs's determination as to the exemption status of any particular employee. The system is intended to provide some guidelines for promotion opportunities, internal mobility, training opportunities and classification of certain skill sets.

*Id.* ¶ 6. The process of "mapping" an employee includes designating the employee into "Job Role," "Job Title," "Job Stream," "Job Family" and "Band." *Id.* ¶ 8. The manner in which an employee is "mapped" depends on the way in which the employee was hired by Amdocs. "When employees are hired directly by Amdocs through external hiring, the family/stream/role/band assignment is approved as part of the budgeting process. Using the family/stream/role/band of the approved position, the potential hiring manager prepares a description of the proposed job duties for recruiting which describes the duties and requirements for the position." *Id.* For employees who become employed through managed services agreements, Amdocs "relies on the information provided by the customer because the customer has the most information about the nature of the work to be performed in the manner that employee performs the work. . . . There are variations to this process depending on: (a) the nature of the managed services agreement, (b) the number of different job titles and descriptions received from the predecessor employer, (c) the number of services being assumed as a result of any particular agreement, (d) the number of locations included in the managed services agreement, and (d) weather and docs currently performs substantially similar services are ready for the same customer." *Id.* ¶ 9. Employees who become employed through a corporate acquisition are mapped in a slightly different manner:

> In the course of 'mapping employees' from a prior employer where all of those employees will be hired, we consult with the employee's supervisor at the predecessor company, the human resources department of the predecessor company, and (if different) the new Amdocs supervisor. In a corporate transaction (unlike in the managed services arrangement where the employee is in fact going to continue to do the same work at Amdocs), an employee's duties at Amdocs may be or may not be different than the work they used to perform at the company that was acquired. As a result, there are further discussions with the predecessor company to understand what the hired employee will be doing upon conclusion of the transaction.

*Id.* ¶ 10. Mapping decisions are made at the manager level, and are not based on any corporate level formula or protocol. Drury Depo. at 99:24-100:3 (Docket No. 295, Ex. 1).

According to Amdocs, an employee's "mapping" within the Amdocs Level System is

independent of an employee's status as exempt from overtime. Wellman Decl. ¶ 13; *see also* Christiansen Supp. Decl. ¶ 7 ("Although I was heavily involved in determining how DST employees were mapped in the Amdocs Level System, the decision as to whether these employees should be classified as exempt or nonexempt for overtime purposes was made by different individuals.").[2] When an employee is hired externally and directly as an Amdocs employee, the decision about whether the position is exempt is made at the time of recruitment. When employees are hired through a managed services agreement or a corporate transaction, the determination of the exemption status can be made concurrent with the mapping process or after the employee has been mapped. The managers in this situation make the mapping decision, and compensation/benefits employees make the exemption decision separately. *Id.*; *see also* Drury Depo. at 74:10-22 ("The – again, the job classification system, it's a global system. It's agnostic to wage-and-hour issues. We could not possibly develop a global system that accounted for all the different wage-and-hour considerations around the world. So it's – it's really not connected to any type of exemption status."). Ms. Wellman also states that "[t]he process for mapping and examining overtime exemption varies from project to project and from employee to employee. How an employee's exemption status was determined may vary depending on the compensation staff, the number of employees who participated in the transition, the type of transaction that brought the employee to Amdocs, and the nature of the employee's work." Wellman Decl. ¶ 18.

## DISCUSSION

In an order filed December 19, 2011, the Court conditionally certified the following collective FLSA classes:

> 1. All California computer employees of Amdocs who were classified as exempt, and who were employed in the following Amdocs Job Families: System Integration, Development & Technology, Technical Business Operations, and Enterprise Support Services, and who were Individual Contributors below the level of Dir-IC, or below the level of Individual Contributors who primarily performed computer support, trouble shooting, testing related to repairs and problem-solving, and/or other technical services for Amdocs. The "Roles"

---

[2] Although plaintiffs argue that Band ranking and exemption status are correlated, and that this correlation is legally significant (an assertion that the Court addresses *infra*), plaintiffs have not submitted any evidence contradicting defendant's evidence that the mapping decision is made separate from the exemption decision.

4

        performed by these similarly situated employees include Sr. Expert, Expert, Sr. SME (Subject Matter Expert), SME, and Associate; or

2. All California computer employees of Amdocs who "transitioned" from AT&T Services Inc. to Amdocs, who were classified as exempt, and who are not Managers according to the Amdocs Level System and who primarily performed computer support, trouble shooting, testing related to repairs and problem-solving, and/or other technical services for Amdocs.

The conditionally certified collective action classes include persons who fall within the above definitions and who worked at Amdocs at any time from April 5, 2008 to the present. Pursuant to the Court's conditional certification order, defendant provided notice of this case to more than 700 current and former and docs employees. Approximately 268 employees have opted-in to the conditionally certified FLSA classes.

Plaintiffs now seek to revise the FLSA classes to exclude: "(1) employees who make more than $100,000 a year; (2) higher ranked employees in Band 4 and above; (3) those in the Job Family of Enterprise Support Services; (4) the sub-class "transitioned" from AT&T (many of whom will nevertheless remain class members due to their Band rank and Job Family), and (5) those holding advanced degrees in computer science or a related field." Docket No. 279 at 3:17-23. Plaintiffs do not define what constitutes a "related field."

Plaintiffs also seek to certify the following, slightly different, class under Rule 23(b)(3):

> All persons employed by Amdocs in California at any time from April 16, 2006 to the present, who were Band 2 or Band 3 employees in either the Development Technologies, System Integration or Technical Business Operations Job Families, and who were designated by Amdocs as "Individual Contributors"[3] except those holding advanced degrees in computer software or a closely-related field.

Docket No. 263 at 2:7-10. Plaintiffs do not define what constitutes a "closely-related field."

Now before the Court are defendant's motion to decertify the conditional collective FLSA classes, and plaintiffs' motion for Rule 23 certification of the state law wage and hour claims.

## I. Defendant's motion to decertify FLSA conditional class

### A. Legal standard

---

[3] At the hearing, plaintiffs' counsel proposed a further revision to the proposed Rule 23 class, with the addition of "or below" after "Individual Contributors."

5

Section 216(b) of the FLSA provides that one or more employees may bring a collective action "on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The FLSA does not define the term "similarly situated," nor has the Ninth Circuit defined it. To determine whether plaintiffs are "similarly situated," courts in this circuit have applied a "two-step approach involving initial notice to prospective plaintiffs, followed by a final evaluation whether such plaintiffs are similarly situated." *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 467 (N.D. Cal. 2004). "The first step under the two-tiered approach considers whether the proposed class should be given notice of the action. This decision is based on the pleadings and affidavits submitted by the parties. The court makes this determination under a fairly lenient standard due to the limited amount of evidence before it . . . In the second step, the party opposing certification may move to decertify the class once discovery is complete and the case is ready to be tried." *Adams v. Inter-Con Sec. Systs., Inc.*, 242 F.R.D. 530, 535-56 (N.D. Cal. 2007).

This Court applied the lenient stage-one standard when it previously certified the conditional classes. At step two of the process, which occurs at the conclusion of discovery, courts engage in a more searching review. *Leuthold*, 224 F.R.D. at 467. At this stage, in order to overcome a motion to decertify a conditionally certified class, "it is plaintiffs' burden to provide substantial evidence to demonstrate that they are similarly situated." *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010). The Eleventh Circuit has noted that at this second stage, "[l]ogically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's Inc.*, 488 F.3d 945, 953 (11th Cir. 2007). The lead plaintiffs in a FLSA collective action have the burden of showing that the opt-in plaintiffs are situated similarly to them. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009); *see also Hill v. R+L Carriers, Inc.*, No. C 09–1907 CW, 2011 WL 830546, at *3 (N.D. Cal. Mar. 3, 2011).

In deciding whether plaintiffs have met their stage-two burden, courts engage in a fact-specific inquiry to evaluate various factors. *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010). "These factors include: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1118

1 (N.D. Cal. 2011). Nevertheless, plaintiffs "must only be similarly—not identically—situated to proceed
2 collectively." *Falcon v. Starbucks*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008). The decision whether
3 to decertify a collective action is within the district court's discretion. *See, e.g., Mooney v. Aramco*
4 *Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995) ("[T]he district court's application of the [legal] standard
5 must be reviewed for abuse of discretion.").

### B. Analysis

Defendant moves to decertify the FLSA class on the ground that plaintiffs have failed to meet their burden to produce substantial evidence showing that class members are similarly situated, and that the record in fact shows that members of the conditionally certified class perform vastly different jobs with different supervisors and in different settings. Defendant states that the opt-in plaintiffs have 51 different job titles[4] with highly divergent job duties, and that the Court would be required to inquire into each class member's job duties to determine whether that employee was properly classified as exempt.

"When determining whether a plaintiff has met its burden of producing substantial evidence to show that putative class members are similarly situated, the first factor courts consider is the degree of similarity among plaintiffs' factual and employment settings." *Beauperthuy*, 772 F. Supp. 2d at 1122. Courts look at whether plaintiffs had differing job titles or duties, worked in different geographic locations, worked under different supervisors, or allege different types of violative conduct. *See, e.g., Reed*, 266 F.R.D. at 449 (noting, "[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors"); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000) ("The first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary."); *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007) (considering "whether plaintiffs had differing job titles or assignments, worked in different locations, were under different supervisors or decision makers, or allege different types of

---

[4] The Wellman declaration states that the opt in plaintiffs have 51 different job titles. Wellman Decl. ¶ 18. The parties dispute whether all of the opt-ins fall within the conditionally certified FLSA classes. The matter is further complicated by plaintiffs' most recent proposed revised FLSA class because a number of the opt-ins would be excluded by the revised class. Regardless, the proposed revised FLSA class would include employees within three Job Families and scores of job titles.

7

violative conduct").

Plaintiffs do not dispute that the proposed revised FLSA class contains employees with numerous job titles, in three different Job Families and two different Bands, and whose job duties vary. Instead, plaintiffs argue that those differences are irrelevant because employees within the same Job Family and Band have similar levels of responsibility, education, experience and areas of competence, and "[b]ecause of Amdocs' elaborate and comprehensive Global Mapping System, a finder of fact can determine, based on common evidence, whether or not Band rank correlates with the level of discretion and independent judgment, with no need for individualized determinations." Docket No. 279 at 3:10-12.[5] Plaintiffs assert that "the Amdocs Level System has determined which employees are similarly situated through a common, uniform, corporate policy and practice." *Id.* at 6:4-5.

As support, plaintiffs rely primarily on the deposition testimony of Thomas Drury, Amdocs' Rule 30(b)(6) designee and Vice President of Human Resources. Plaintiffs assert that Drury's testimony shows that "Amdocs has admitted that while there are differences between Job Families, employees in the same Job Family and who have the same Band rank are similarly situated regardless of where they worked, for whom they work, or what particular job they did." *Id.* at 2:15-18. In the cited portion of Drury's deposition testimony, however, Drury testified only that "our band systems, or if you can think about it vertically and horizontally, bands generally speak to the horizontal element of it. The vertical elements refer to job families. So – and job – a job family, and I think it's defined in here what a family is, a broad grouping of jobs in the professional category that require similar education[,] experience and competencies." Docket No. 295-1 at 84:12-19. Testimony that job families consist of a "broad grouping of jobs" that "require similar education[,] experience and competencies" does not, on its own, establish that all employees within the same Job Family and Band rank are similarly situated. *See Reed*, 266 F.R.D. at 450 ("[G]eneralized commonalities do not make Plaintiffs similarly situated within the meaning of the FLSA").

Drury also testified, consistent with the testimony of Amdocs managers, that the mapping

---

[5] The Court notes that a number of the class member declarations submitted by plaintiffs do not state the employees' Job Family and Band ranking. *See, e.g.,* declarations of Estelle Graves, Lorraine Mun, and Sherri Piper (Docket No. 267-1).

8

decisions are made at the individual manager level, and not based on any corporate-level policies. In response to a question asking "Is there, like, a formula or a – or a protocol that – that the company uses to determine which band a particular employee fits into?" Drury responded, "No, not really. I mean, it's – it's probably more based on comparability. We know that we want to hire a human resources person, and we know what that person – we know what we want that person to do for us. We're – we – we have enough HR people running around that we know, you know, how this person's role would compare to others, and the band would result from that." Drury Depo. at 99:24-100:9. Thus, Drury's testimony does not support plaintiffs' assertion that employees are mapped pursuant to a common, uniform, corporate policy and practice.

Plaintiffs repeatedly assert that Drury's testimony shows that Band rank is determinative of discretion and independent judgment, and that differences in job duties are irrelevant to the key question of whether class members customarily exercised discretion and independent judgment with respect to matters of significance.[6] However, Drury's testimony does not support this assertion. Drury testified that Amdocs divides employees into Bands "to distinguish between levels of expertise, knowledge, capability, so that in general, those within a job family, those at the lower band levels, you would have an expectation of them having lower levels of ability, knowledge, expertise in a given subject area, and higher levels would have highers – higher – higher degrees of it." Drury depo. at 98:20-99:1 (Seplow Decl. Ex. 1). Drury also testified that to determine what Band an employee should be placed in, Amdocs evaluates "job duties, responsibilities, the scope of work that's expected from that employee, and that goes into – that – that's a large amount of what goes into determining the band." *Id*. at 99:16-23. While Drury's testimony supports the proposition that employees at higher band levels have greater levels of responsibility, Drury's testimony does not demonstrate that all Band 2 and 3 employees do not exercise discretion and independent judgment with respect to matters of significance. Even if it is correct that those with a higher Band rank exercise greater discretion and independent judgment than lower-ranked employees, it does not necessarily follow that the lower–ranked employees do not exercise

---

[6] Although defendant asserts that class members are subject to at least five different exemptions, plaintiffs contend that the central question to resolve the misclassification claim is whether class members exercised discretion and independent judgment with respect to matters of significance because discretion and independent judgment is a requirement of multiple exemptions at issue.

9

discretion and independent judgment with respect to matters of significance. *Cf. Hernandez v. United Auto Credit Corp.*, No. C-08-03404 RMW, 2010 WL 1337702, at *4 (N.D. Cal. Apr. 2, 2010) (decertifying conditional FLSA class involving executive exemption and stating, "Plaintiffs' argument appears to rely on the inference that if [higher level] Branch Managers and Assistant Branch Managers 'manage' employees, then [lower level class member] Collections and Administrative Supervisors must not. However, plaintiffs provide no basis for drawing such an inference and provide no support for their contention that supervisors 'supervise' and do not 'manage.'").

Moreover, the FLSA regulations provide that determining independent judgment and discretion requires an analysis of an employee's actual job duties. *See* 29 C.F.R. § 541.202(b) ("Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: . . . whether the employee carries out major assignments in conducting the operations of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee provides consultation or expert advice to management . . . whether the employee investigates and resolves matters of significance on behalf of management . . . ."). Plaintiffs have not demonstrated how Drury's testimony about Band rankings establishes that employees in Bands 2 and 3 necessarily lack discretion and independent judgment with respect to matters of significance, nor have they shown that a factfinder would not be required to examine class members' actual job duties to determine whether class members exercised discretion and independent judgment with respect to matters of significance.

Plaintiffs also assert that "there is an undeniable direct correlation between Band rank and exempt status. All California Band 1 employees are classified non-exempt. All Band 2 employees and above are classified exempt." Docket No. 279 at 5:23-25. However, to the extent that plaintiffs contend that the misclassification claims are amenable to classwide treatment because all Band 2 and Band 3 employees are exempt, this argument fails both factually and legally. As a factual matter, Drury testified that some Band 2 employees are designated as non–exempt. Drury Depo. at 74:23-75:9. As a legal matter, the Ninth Circuit has held that "[t]he fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as

10

to whether class members are actually performing similar duties." *In re Wells Fargo Home Mortg. Litig.*, 571 F.3d 953, 959 (9th Cir. 2009).

In opposing defendant's decertification motion, plaintiffs have also submitted numerous declarations from class members; however, a significant number of those declarations do not identify the class members' Band and/or Job Family, and plaintiffs have not shown how (1) the named plaintiffs are similarly situated to the class members they seek to represent, or (2) how class members within the different Bands and Job Families are, in fact, similarly situated. In fact, the evidence before the Court shows significant disparities in the job duties of class members, as well as employment settings. For example, lead plaintiff Santiago and opt-in Riley Carter were both Band 2 employees in the Development and Technology Job Family.[7] Santiago testified that he was generally responsible for running computer applications through a series of test cases to ensure there were no bugs in the system's code, and he did not write code. Santiago Depo. at 32:11-19; Santiago Decl. ¶ 4. Mr. Carter, in contrast, "performed software development work, writing code on behalf of the data services team. He supported a set of applications in the data service area that included 200-250 separate billing programs that supported billing systems in California and Nevada that AT&T utilized to issue bills. . . . In addition to writing code, he supported follow-up work on those applications related to coding revisions." Williams Decl. ¶ 6. Another Band 2 employee in the Development and Technology Job Family, opt-in Todd Stewart, testified that he does not develop code, and instead he has a "system management role, where I manage Oracle databases, database installations, make sure they are up to date, as well as an application database administrator role, where I work with Amdocs development teams to maintain applications, you know, for AT&T." Stewart Depo. at 158:4-11, 42:2-7.[8] These are just a few examples of the differences in class member job duties. The Court also finds it significant that class members worked in a variety of locations and settings, with some working at home for some portion of

---

[7] Plaintiffs state that Santiago was a Band 2 employee in the Development and Technology Job Family. Docket No. 263 at 2:10-12; *see also* Carter Decl. ¶ 1.

[8] After Mr. Stewart was deposed, plaintiffs produced to defendant a copy of Mr. Stewart's diploma showing that he has a Masters in science in telecommunications management from Golden Gate University. Jordan Decl. Ex. T. Plaintiffs' papers do not state whether, in their view, Mr. Stewart falls within the proposed revised FLSA class, which excludes individuals who hold "advanced degrees in computer science or a related field." Mr. Stewart is an example of such an individual

time, and many class members having little to no direct interaction with their supervisors.

For these reasons, the Court finds that plaintiffs have not met their burden at the second stage to produce substantial evidence showing that the named plaintiffs and class members are similarly situated and that the misclassification claims can be litigated on a classwide basis. The Court finds instructive *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1118 (N.D. Cal. I011), in which Judge Samuel Conti decertified a conditionally certified class of General Managers, Operations Managers, and Field Managers who claimed that they had been misclassified as exempt. In opposing the defendant's motion for decertification of the FLSA class, the plaintiffs argued, similar to plaintiffs' contentions here about Drury's testimony, that the deposition testimony of the defendant's Rule 30(b)6 designee established that managers within each of three separate business functions, or "silos,"[9] "had the same duties and responsibilities as other managers in the same position across all clubs, regions, and states, throughout the entire claims period." *Id.* at 1129. Judge Conti found the plaintiffs' contention unpersuasive for several reasons:

> As to Plaintiffs' first theory—that Bruhn's deposition testimony is sufficient to support a finding that all class members are similarly situated—Defendants offer several persuasive rebuttals. First, Defendants note that Bruhn's testimony says nothing about the job duties of managers across silos. In other words, Bruhn's testimony is silent as to whether a GM's duties resembled those of an OM or an FM. Second, Defendants note that Bruhn only testified that managers within each silo "would have" or "should have" performed the same duties, not that they actually did so. By contrast, Defendants point to deposition testimony, discussed below, from numerous class members suggesting that managers' job duties varied both within and across silos. In light of the testimony of actual class members as to differences among managers' job duties, both within and across silos, Defendants contend that Bruhn's testimony that managers within each silo "should have" had the same duties is not substantial evidence that all class members are similarly situated. The Court agrees with Defendants.

*Id.* Judge Conti found that the evidence showed that "the job duties of managers varied significantly across silos" and that "even managers within the same silo often performed substantially different

---

[9] The *Beauperthuy* court explained the "silos" as follows: "Twenty–Four hour divides its clubs into separate business functions, or 'silos.' Over time, their model has shifted from two silos: production (encompassing sales and fitness) and operations; to three silos: sales (sales of membership agreements), operations (administering club operations), and fitness (promotions of health and physical training and sale of training packages). Generally speaking, though not always, there is one manager in each club overseeing each silo: GMs oversee sales; OMs oversee operations; and FMs oversee the promotion of health and fitness and the sale of personal training packages." 772 F. Supp. 2d at 1128 n.13.

12

functions." *Id*. at 1130. Judge Conti rejected the plaintiffs' assertion that managers' job duties were similar because those duties were non-managerial in nature. "Even if Plaintiffs are correct that the primary duties of class members were non-managerial, that would not be enough to support a finding that they are similarly situated. Rather, Plaintiffs must show that there was a substantial level of commonality among the allegedly non-exempt duties they performed." *Id*. at 1131. Judge Conti held that, "[t]he substantial disparities among Plaintiffs' job duties weigh in favor of decertification." *Id*. at 1132.

Judge Conti next considered whether the defendant asserted defenses that would require individualized proof. "Where, as here, significant differences exist among the job duties of the putative class members (even for managers with the same job title), a determination whether class members qualify for FLSA overtime exemptions will necessitate an individualized inquiry into the circumstances of each Plaintiff. . . . As noted above, the deposition testimony of members of the Manager Class shows that for every manager who says one thing about his or her job duties and responsibilities, another says the opposite. In light of these discrepancies, representative testimony would be inadequate to determine whether Plaintiffs were properly categorized as exempt." *Id*. at 1133. Based upon the evidence of varying job duties amongst class members and the absence of proof that the plaintiffs' injuries resulted from a single, unified policy, Judge Conti decertified the conditionally-certified manager class. *Id*. at 1134. Judge Conti also rejected the plaintiffs' proposal to divide the manager class into three subclasses of Operations Managers, General Managers, and Field Managers because "the evidence shows that even within each silo the duties and responsibilities of managers differed widely. Moreover, proceeding with subclasses would not change the fact that individualized inquiries will still be required to determine whether each plaintiff qualifies for one of the FLSA overtime exemptions. Proceeding with subclasses would therefore do little to lessen the chaos and inefficiency that would result from proceeding with a single collective action." *Id*. at 1135. Similarly, although plaintiffs suggest that the Court could certify subclasses narrowed by Job Family and/or Job Stream, plaintiffs have not shown how class members within each Job Family (or Job Stream) are similarly situated such that class treatment is appropriate.

As in *Beauperthuy*, plaintiffs attempt to gloss over significant differences in class members' job duties by arguing that Drury's Rule 30(b)(6) testimony establishes that all Band 2 and Band 3 employees

13

lack discretion and independent judgment with respect to their job duties, and that all employees within a particular Job Family are similarly situated. However, Drury's testimony does not support either of those contentions, and in fact the record shows that even class members with the same job title, same Band ranking, and within the same Job Family have very different job duties in a variety of employment settings. The Court would be required to engage in individualized inquiries to determine whether each class member was properly classified as exempt. Courts in this district have decertified much narrower conditional FLSA classes based upon evidence that class members' job duties differed significantly and class members worked in disparate employment settings. *See, e.g., Hill v. R+L Carriers, Inc.*, No. C 09–1907 CW, 2011 WL 830546 (N.D. Cal. Mar. 3, 2011) (decertifying class of "City Dispatchers" where evidence showed that class members had varying degrees of involvement in personnel matters, training, and ability to make decisions independently, and thus determining applicability of administrative exemption would require individualized inquiries); *Hernandez.*, No. C-08-03404 RMW, 2010 WL 1337702 (in case involving executive exemption, decertifying conditional class of five types of supervisors where evidence showed variation in amount of management duties). Plaintiffs also have not identified any policy that has allegedly caused their injuries, and to the contrary the record shows that "mapping" decisions are made at an individual manager level, and that the exemption decisions are made separate from the mapping process.

## II. Plaintiffs' motion to certify state law claims under Rule 23(b)(3)

"Courts have held that FLSA's "similarly situated" standard is less stringent than Rule 23(b)(3)'s requirement that common questions of law and fact predominate." *Hill v. R+L Carriers, Inc.*, No. C 09–1907 CW, 2011 WL 830546, at *3 (N.D. Cal. Mar. 3, 2011) (citing *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584–87 (6th Cir. 2009), and *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)). The Court's conclusion that plaintiffs have failed to demonstrate that the class members are "similarly situated" for purposes of the FLSA overtime claims forecloses certification of a similarly defined Rule 23 class for plaintiffs' state law overtime claims.

Further, because California law requires an employer to provide uninterrupted meals periods and authorize and permit rest breaks only for nonexempt employees, plaintiffs' meal and rest break claims

are derivative of their claims that defendant misclassified them as exempt employees. *Dailey v. Sears, Roebuck and Co.*, 214 Cal. App. 4th 974, 1000 n.12 (Cal. App. 2013). "Because [plaintiffs'] theory of liability regarding the proposed class members' alleged nonexempt status is not suitable for class treatment, it follows that [the] meal period/rest break claims also properly are not certified." *Id*.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion for decertification and DENIES plaintiffs' motion for certification of the state law claims. This order resolves Docket Nos. 260 and 263.

**IT IS SO ORDERED.**

Dated: September 30, 2013

SUSAN ILLSTON
United States District Judge